# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM J. HALL II, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 06 C 6011 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| CITY OF AURORA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant, the City of Aurora, Illinois ("Aurora"), moves for summary judgment against Plaintiff, William J. Hall II ("Hall"), on Hall's claim that Aurora violated his rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1. For the reasons stated below, Aurora's motion for summary judgment is granted.

## I. Background

The facts relevant to this case center on the process for promoting police officers in the city of Aurora, Illinois. In the Aurora Police Department, promotions take place in accordance with what the parties call the "Rule of 6." (Def.'s LR 56.1 Stmt., ¶ 8.) Members of the police force who want to be promoted to the rank of sergeant or lieutenant undergo a testing process overseen by Aurora's Civil Service Commission. (*Id.*, ¶¶ 6-8.) The Civil Service Commission uses written tests and other evaluative methods to establish an eligibility list for promotions that

is valid for the next three years. (*Id.*, ¶ 7.) Under the Rule of 6, the Chief of Police must choose from among the top six candidates on the list in filling any promotional vacancy during that time. (*Id.*, ¶ 8.) The parties do not dispute that, historically, officers were promoted in the order of their ranking on the eligibility list.

In November 2005, William Powell became Aurora's Chief of Police. (Def.'s LR 56.1 Stmt., ¶ 11.) Powell testified that upon assuming the position of Chief, he "told people . . . I'm not going to promote people, because they're a number on the list . . . and I was going to pick the person who . . . I felt . . . and the command staff would think are the best fit for the job." (*Id.*, ¶ 12; Powell Dep. at 33.) Powell implemented a system wherein his "Command Staff" (a group composed of the Chief, Deputy Chief, and department Commanders) would interview the top six candidates from the eligibility list and discuss their impressions of the candidates in a meeting with Powell.[1] (Def.'s LR 56.1 Stmt., ¶¶ 13-14.) Powell would then select a candidate based on the input of the Command Staff as well as "promotional packets" that were prepared for each candidate containing evaluation results and other information, including information about sick

---

[1] Hall "disagree[s] that all six candidates are interviewed, reviewed, and discussed by the Command Staff." (Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 13.) Hall points to testimony by Powell indicating that he could not remember whether two officers, Brian Olsen and Raymond Parks, were interviewed in connection with their promotions. (Powell Dep. at 38.) However, at another point in his testimony, Powell describes candidates being interviewed by the Command Staff. (Powell Dep. at 35.) Furthermore, Powell's testimony indicating that the interviews took place is corroborated by other witnesses. Deputy Chief Gregory Anderson describes the Command Staff interviewing candidates at least twice in his deposition. (Anderson Dep. at 30, 38.) Another Command Staff member, John Dobran, also corroborates the fact that interviews took place, (Dobran Dep. at 20.) as does Michael Gilloffo, who testified that "first we did the interviews with all the candidates" in connection with the April 2006 promotion. (Gilloffo Dep. at 19.) In this context, Powell's statement that he did not recall the interviews of two particular candidates, with no other evidence to suggest that the interviews did not take place, does not make the fact that candidates were interviewed "genuinely disputed."

leave. (*Id.*, ¶ 14; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 14; Powell Dep. at 46-53.) Although Powell's system incorporated promotional packets and Command Staff input, the first three individuals who were promoted after Powell became Chief were promoted in the order of their ranking on the eligibility list. (Pl's Resp. to Def.'s LR 56.1 Stmt., ¶ 12.)

At all times relevant to this case, Plaintiff William Hall II was a sergeant on the Aurora police force. (Def.'s LR 56.1 Stmt., ¶ 16.) Prior to December 2005, Hall was a patrol officer; in December 2005, he was reassigned to the department's "Special Operations Group" ("SOG"), which specialized in drug investigations and gang issues. (*Id.*) Deputy Chief Gregory Anderson testified that when he informed Hall of his transfer to the SOG, he told him that being in the SOG would give him an opportunity to show others that he was ready for promotion. (Anderson Dep. at 96-98.) This was important because most of his prior experience was as a patrol officer. (*Id.*) Hall remembers the conversation differently and claims that Anderson told him he was already ready for promotion and that the reassignment would be short in duration because a promotion was a "foregone conclusion." (Hall Dep. at 50-51.) Hall also testified, however, that Anderson told him the SOG assignment would be a "stepping stone to your next level," (*Id.* at 50.) which is more ambiguous than the alleged "foregone conclusion" remark.


## A.    The April 2006 Promotion

In April 2006, a lieutenant position became available, and Hall was one of six candidates considered for the job. The Command Staff met and discussed all six candidates for the

position.[2]  (Def.'s LR 56.1 Stmt., ¶ 19; Groom Dep. at 7; Gilloffo Dep. at 18.)  At the meeting, the Command Staff discussed Hall's performance.  The Commanders raised several issues, including the fact that Hall had mostly patrol experience, the perception that some aspects of his performance as a supervisor were "not overly impressive," and his reputation as a "schmoozer." (Groom Dep. at 18-20.)  Deputy Chief Anderson recalled saying that "I don't think [Hall] had demonstrated the appropriate adaptability to be promoted at this time . . . based on his performance down in the [SOG unit]"; he also testified that Commander DoBran, Hall's commanding officer, said that Hall "had issues" and "[h]adn't really stepped up to the plate." (Anderson Dep. at 42, 99.)  Ultimately, Chief Powell selected Sam Turnbow, and Turnbow was promoted to lieutenant on April 29, 2006.  (Def.'s LR 56.1 Stmt., ¶ 22.)  Turnbow was the highest-ranked candidate on the eligibility list at that time and was ranked immediately above Hall.  (Def.'s LR 56.1 Stmt., Ex. 1.)  After Turnbow's promotion, therefore, Hall was the highest-ranked candidate on the eligibility list who had not yet been promoted to lieutenant.

## B.    Hall's FMLA Leave and Conflict with Lieutenant Parks

Slightly more than two weeks after the April 29, 2006, promotion decision, Hall filed an FMLA leave request with the city of Aurora's human resources department, which is independent

---

[2]  As with the objection discussed in footnote 1 *supra*, Hall claims that there is a material issue of fact regarding whether this meeting took place.  As support for his position, Hall claims that Deputy Chief Anderson had no recollection of the meeting.  In fact, as noted in the body of the opinion, Deputy Chief Anderson is one of several witnesses who recalled the meeting. Because all of the available evidence suggests that the meeting did take place, there is no issue of material fact.  Addressing another of Hall's objections, the Court fails to see how Aurora's alleged failure to produce a promotional packet for one of the six candidates, Turnbow, creates a genuine issue of fact as to whether the meeting took place.

from the police department. (Def.'s LR 56.1 Stmt, ¶¶ 23-24.) Hall's request was somewhat ambiguous, as it stated that "[i]n recent days a situation has occurred that has dramatically impeded my wife's ability to care for our new child," and requested "leave as soon as possible in order to properly care for my newborn child." (Def.'s LR 56.1 Stmt., Ex. 3.) Apparently, there was some confusion within the human resources department as to whether this was a request for leave due to his wife's medical condition (which would require medical documentation) or a request for leave to care for his newborn son (which would not require documentation). (*Id.*, ¶¶ 24-26; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶¶ 24-26.) Ultimately Hall and the human resources department came to an understanding that the leave was for child care purposes, and his leave request was granted effective May 20, 2006. (Def.'s LR 56.1 Stmt., ¶¶ 26-27.)

Hall's FMLA leave continued until he returned to work on July 13, 2006. (Def.'s LR 56.1 Stmt., ¶ 28.) At the beginning of this leave period, an incident occurred between Hall and his supervisor, Lieutenant Parks. Parks and Hall came into conflict because no one told Parks that Hall was taking FMLA leave, although Chief Powell and Lieutenant Hoffman were copied on a May 18 letter to Hall that confirmed his leave, and a human resources department employee told Hall not to worry about further notification.[3] (Def.'s LR 56.1 Stmt., ¶ 29, Ex. 2; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 30.) Unaware of Hall's leave status, Parks attempted to contact him at work on May 21, 2006. (Def.'s LR 56.1 Stmt., ¶ 30.) Parks then called Hall at home, and Hall

---

[3] Hall's objection to this paragraph of Aurora's Local Rule 56.1 statement states: "Disagree with the inference that Sgt. Hall had any duty or obligation [to notify the police department]." Local Rule 56.1(b)(3)(B) clearly contemplates that a non-movant's responses to an opponent's factual submissions shall be concise and factual in nature. To the extent that Hall's objections are arguments about the significance or interpretation of facts rather than the truth or falsehood of Aurora's factual assertions, they are improper and the Court will not take them into account.

informed him that he was on leave. (*Id.*) The parties agree that Parks became angry. (Def.'s LR 56.1 Stmt., ¶ 31.) Parks testified that he was upset at Hall for not calling him directly to inform him about his leave status, both for "courtesy's sake" and because Parks was "caught short" by Hall's unexpected absence. (Parks Dep. at 84, 88.) Hall's conflict with Lieutenant Parks led him to request a transfer out of the SOG unit, which Chief Powell denied on July 7, 2006. (Def.'s LR 56.1 Stmt., Ex. 7.)

## C.     The June 2006 Promotions

In June 2006, while Hall was still on FMLA leave, three lieutenant positions became available. (Def.'s LR 56.1 Stmt., ¶ 37.) Because there were three vacancies instead of one, the department considered eight candidates instead of the usual six; Hall was one of the candidates. (*Id.*) On June 8, 2008, Chief Powell convened a meeting of the Command Staff to discuss which three candidates would be promoted to lieutenant. (*Id.*, ¶ 38.) Afterwards, Hall received a phone call from Commander Langston, who was present at the meeting. (*Id.*, ¶ 35.) Langston remembers telling Hall that his FMLA leave was discussed at the meeting and that he was criticized for not contacting Lieutenant Parks to inform him of his planned absence. (*Id.*) Hall gives a different account of the phone conversation, alleging that Langston told him that one of the Commanders stated: "Who the hell does Hall think he is that he can just go on this FMLA leave and leave us shorthanded." (Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶¶ 35-36; Hall Dep. at 89.) According to Hall, Langston "hinted" that the person who made this statement was Commander Groom. (Def.'s LR 56.1 Stmt. ¶ 33; Hall Dep. at 89.) Langston denies making these statements to Hall. (Def.'s LR 56.1 Stmt., ¶ 36.)

It is undisputed that five out of the six Commanders present at the June 8 meeting recommended against promoting Hall. (Def.'s LR 56.1 Stmt., ¶ 38.) Deputy Chief Anderson testified that he told the others at the meeting that he did not believe Hall was the best candidate and that Hall's performance had not improved significantly since April 2006, when Anderson had last recommended against promoting him.[4] (Id., ¶ 38(A).) Commander DoBran testified that the Commanders expressed disappointment with other aspects of Hall's performance in the SOG, including scheduling problems and problems with radio calls. (Dobran Dep. at 38-40.) While Commander Langston claims that he supported Hall's candidacy during the meeting, Commander Thomas said that Langston "didn't have a lot of positives to say" about Hall; indeed, Commander Thomas remembered Langston talking about Hall "dropping the ball" and specifically mentioning some problems related to scheduling. (Thomas Dep. at 29.) Commander Groom also recalled Langston saying that Hall had "dropped the ball" on a few tasks. (Groom Dep. at 44.) Groom testified that he gave "great credence" to those remarks. (Id.)

After consulting with the Command Staff, Chief Powell selected Officers Rolison, Brosi, and Hull for promotion. (Def.'s LR 56.1 Stmt, ¶ 39.) As discussed above, Hall (ranked number five) was the top-ranked candidate remaining on the eligibility list at the time of the June promotions. Of the officers who were promoted, Rolison was ranked number six, Brosi was number eleven, and Hull was number twelve. (Id.) Of the five Command Staff members who did not recommend Hall for promotion, five recommended Hull, while Brosi and Rolison

---

[4] Hall objects to this statement of fact, but his objections address the substance of Anderson's criticism rather than the question whether Anderson expressed his criticism at the meeting. Therefore, this objection is not on point and will be disregarded, as will other objections to the substance of other criticisms alleged to have been voiced at the meeting.

received four recommendations each. (*Id.*, ¶ 38(A)-(E).) It is not clear from Commander Langston's testimony whether he actually supported these candidates, although he did state that he "would have no qualms voting for Hull" over Hall for the third lieutenant spot and recalled that Commanders Groom and DoBran had high praise for Brosi. (Langston Dep. at 66-68.) While Hall was ranked higher than all three of the candidates who were promoted, there were also four candidates on the eligibility list (Peter Inda at number seven, Robert Hladik at number eight, Richard Handell at number nine, and Nicholas Coronado at number ten) who were ranked higher than Brosi and Hull but were not promoted. (Def.'s LR 56.1 Stmt., Ex. 1.) Hall was the only candidate of the eight who had taken FMLA leave. (*Id.*, ¶ 42.)

Hall discussed the June 2006 promotions with his superiors at the police department on several occasions. A memorandum prepared on June 23, 2006, by Commander DoBran describes two conversations with Hall regarding the promotions. (Def.'s LR 56.1 Stmt., Ex. 6.) The first conversation occurred sometime during the week of June 10, 2006, after the Command Staff met to discuss the promotions but before Hall learned he would not be promoted. (*Id.*) Hall told DoBran about his argument with Lieutenant Parks over Hall's failure to directly notify Parks that he was taking FMLA leave. (*Id.*) DoBran told Hall that he believed Hall had followed the proper procedure and that he was not in any trouble, but added that it would have been a "nice" courtesy had he informed Parks. (*Id.*) The second conversation took place on June 22, 2006, when DoBran called Hall to inform him that he was not being promoted. (*Id.*) When Hall asked why, DoBran told him that the Command Staff felt that he had been given an opportunity to "shine" and demonstrate leadership when he was assigned to the SOG unit and that he had not done so. (*Id.*; Hall Dep. at 104.)

Hall also discussed the June 2006 promotions with Deputy Chief Anderson on July 28, 2006. (Def.'s LR 56.1 Stmt., ¶ 45.) According to Hall, Anderson told him that the Command Staff had considered his performance during a "kidnapping incident" and a "weed and seed project" in determining that he was not ready for promotion. (Hall Dep. at 162-63.) Anderson's contemporaneous e-mail describing the conversation also mentions a "kidnapping incident in which [Hall] was not made a team leader" as well as a "Weed and Seed project" in which Hall took almost three months to give Anderson some documentation he required. (Def.'s LR 56.1 Stmt., Ex. 16.) During their conversation, Hall told Anderson that he believed Parks was violating his FMLA rights by requiring him to do the same amount of work as a full-time employee while he was still on intermittent leave; Anderson suggested that human resources, rather than internal affairs, would be the place to bring such a complaint. (*Id.*)

### D. Hall's Return from FMLA Leave and Subsequent Medical Leave

On July 13, 2006, Hall returned from FMLA leave. (Def.'s LR 56.1 Stmt., ¶ 43.) Following his return, he had another confrontation with Lieutenant Parks in which Parks told him that he had acted unprofessionally when he failed to notify Parks of his FMLA leave. (*Id.*) Hall told Parks that he would continue to be on an "intermittent leave status," meaning that he would only be working four days per week. (Hall Dep. at 143; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 43.) According to Hall, Parks told him that he could not accommodate Hall's intermittent leave status and that Hall would be expected to do the same amount of work as everyone else. (*Id.*) In a memorandum prepared on July 21, 2006, Parks recalled the exchange somewhat differently, stating that he told Hall that he "believed [Hall] would have sufficient time to complete his

duties, working four days per week." (Def.'s LR 56.1 Stmt., Ex. 13.) Parks denied telling Hall

that his leave would interfere with the operation of the unit, although he acknowledged at his

deposition that Hall's absence was an inconvenience. (Parks Dep. at 125.) The parties agree that

Hall was upset and that he threatened to sue Parks and the police department for violating the

FMLA. (Def.'s LR 56.1 Stmt., ¶ 43.)

At approximately the same time, in mid-July, Hall had a panic attack with physical

symptoms that led him to seek treatment at a hospital emergency room. (Hall Dep. at 151-52.)

After being discharged from the hospital, Hall visited his regular doctor, who diagnosed him with

depression and "acute stress" and recommended that he take some time off of work. (*Id.* at 153.)

Hall informed the department that he was taking what he characterized as "stress leave," and was

on paid medical leave from July 18, 2006, through October 17, 2006. (*Id.* at 153-54; Def.'s

LR 56.1 Stmt., ¶¶ 46-47.) According to human resources department policy, Hall was required

to submit a "return to duty" form completed by a physician every thirty days while on leave in

order to verify his continuing medical condition. (Def.'s LR 56.1 Stmt., ¶¶ 48, 50.) Hall had

some conflict with the human resources department because he was not submitting this form

regularly. (*Id.*, ¶ 50.) Furthermore, there was confusion because the form Hall submitted on

July 31, 2006, had circles around both "Patient Returned to Restricted Duty" and "Patient

Returned to Regular Work Duties," contained a notation reading "no work @ this time," and

listed Hall's prognosis as "unknown."[5] (*Id.*, ¶ 51; Pl.'s Ex. 36.)

---

[5] While Hall disputes this fact, it is apparent from the face of the document, which is
among Hall's own exhibits.

Perhaps as a result of this confusion, in September 2006 Chief Powell exercised the department's right under its collective bargaining agreement with the police officers' union to request that Hall allow an independent physician to examine him. (Def.'s LR 56.1 Stmt., Ex. 17.) In response, Hall filed a union grievance on the grounds that the doctor the department requested him to see, a Dr. Ostrov, was a psychologist and therefore was not truly a "physician." (Id.) Further jousting ensued. On October 9, Chief Powell responded to the union's grievance letter and instructed the human resources department to schedule an appointment with a different doctor. (Id., ¶ 53.) On October 11, Hall received a letter requesting that he undergo an examination by Dr. Alexander Obolsky, an independent physician selected by Aurora. (Id., ¶ 54, Ex. 20.) On October 13, Hall responded that he would not comply with this request because Dr. Obolsky would not provide him with "any of the medical waiver forms that the City of Aurora has provided," rendering him unable to make an informed decision about his rights. (Id., Ex. 22.) Ultimately the issue became moot within a few days, as Hall's own physician authorized him to return to work without restrictions on October 17, 2006. (Id., ¶¶ 56-57.) However, Chief Powell did request that the internal affairs department investigate Hall's "insubordination" in resisting an independent examination. (Id., ¶ 58.) The investigation found that Hall had not committed an infraction. (Id., ¶ 59.)

### E.   Hall's Second Medical Leave and Subsequent Events

Only two days after his doctor cleared him and he returned to full duty, Hall was injured in an altercation with a burglary suspect while assisting other officers. (Def.'s LR 56.1 Stmt., ¶ 60; Hall Dep. at 201-02.) Following his injury on October 19, 2006, Hall was on medical leave

until March 22, 2007. (Def.'s LR 56.1 Stmt., ¶ 60; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 60.)

After he returned, he was on "desk duty . . . doing administrative work." (Hall Dep. at 202.) His hours were also reduced, resulting in four-hour workdays. (*Id.* at 203.) Hall returned to full duty on August 15, 2007. (*Id.* at 309-310.) In June 2007, while Hall was on light duty, three new lieutenant positions became available. (Def.'s LR 56.1 Stmt., ¶ 61.) Although Hall was again the highest-ranked candidate on the eligibility list at number five, no member of the Command Staff recommended promoting him. (*Id.*, ¶ 64.) Chief Powell selected Officers Inda (number seven), Handell (number nine), and Coronado (number ten), while Officer Hladik (number eight) was not promoted. (*Id.*, ¶ 61, Ex. 1.) According to Hall, Hladik had already tendered his resignation when these promotional decisions took place. (Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 68.)

In October 2007, approximately two months after Hall returned to full duty, Deputy Chief Anderson retired, leading to some shuffling of the police department leadership and ultimately creating a vacant lieutenant position. (Def.'s LR 56.1 Stmt., ¶ 66.) Hall, once again the highest-ranked candidate, interviewed with the Command Staff. (*Id.*, ¶ 67.) During his interview, Chief Powell told him that he needed to "sell himself," and Hall discussed his achievements and qualifications. (Hall Dep. at 292-93.) He was contacted approximately one week later by Commander Hoffman and informed that he would not be promoted. (*Id.* at 296.) Hoffman suggested that Hall meet with him to discuss the promotion decision, but Hall declined because he was about to go on vacation. (*Id.*) Hall never discussed the October promotional decision with Hoffman or any other member of the Command Staff, and agrees with Aurora's assertion that he "has absolutely no idea what went on" in the promotional meeting and "no

knowledge of the events which transpired during the Command Staff's deliberations." (Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶¶ 65, 70.)

## II. Discussion

As a preliminary matter, the Court must address several motions to strike that Hall and Aurora have filed in connection with the underlying motion for summary judgment. The initial salvo in this skirmish was fired on February 19, when Hall filed a motion to strike portions of Aurora's Local Rule 56.1(a)(3) statement of undisputed facts. Aurora responded with a volley of three separate motions: to strike Hall's response to Aurora's Local Rule 56.1(a)(3) statement; to strike Hall's Local Rule 56.1(b)(3) statement of additional facts; and to strike Hall's response to Aurora's motion for summary judgment in its entirety. Aurora later added a motion to strike Hall's affidavit in support of his response to Aurora's motion for summary judgment.

While the Court is entitled to demand strict compliance with Local Rule 56.1, *Ammons v. Aramark Uniform Svcs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), the ultimate decision whether to strike a party's filings for violating the rule is entrusted to the Court's discretion. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir. 2006). Aurora's Local Rule 56.1 motions share three common premises. They allege that Hall's responses are improperly argumentative; that Hall improperly asserts additional facts in his responses to Aurora's assertions rather than in a separate statement; and that Hall's factual assertions are not supported by citations to the record. The Court appreciates Aurora's vigilance in upholding the standards of Local Rule 56.1, which are all too often ignored. *See Chism v. Kenall Mfg. Co.*, No. 06 C 3374, 2008 WL 506115, at *1-2 (N.D. Ill. February 15, 2008). While Aurora's arguments are not without merit, the Court

- 13 -

has chosen in its discretion not to strike Hall's responses and factual statements outright. However, in accordance with the rules governing summary judgment, the Court has not accepted non-factual arguments or unsupported statements as fact and has relied only on those assertions that are supported by "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007). For the same reasons, the Court denies Aurora's motion to strike Hall's affidavit on relevancy and competency grounds. The Court has credited only relevant and competent evidence in deciding this motion.

Hall's motion to strike portions of Aurora's Local Rule 56.1(a)(3) statement of facts is also denied. Hall argues that Aurora's statement improperly includes more than eighty statements of fact in violation of Local Rule 56.1(a). In making this argument, Hall appears to interpret "statements of fact" to mean "factual assertions." Aurora responds that Local Rule 56.1(a) refers to "short numbered *paragraphs*," and restricts the movant to "80 separately-numbered statements." Because the rule provides that the movant's factual submissions shall be organized on the basis of numbered paragraphs, Aurora argues that the limit of eighty "separately-numbered statements" should be understood to mean eighty paragraphs. Because its Local Rule 56.1(a)(3) statement contains only seventy-nine paragraphs, Aurora maintains that it has complied with the rule.

Hall has raised a good point: Local Rule 56.1 is, on its face, ambiguous. It uses the term "statement" inconsistently, first to refer to the document as a whole, and later to refer to components of that document. Furthermore, it refers to "numbered paragraphs" in one sentence and "numbered statements" in another. However, Aurora's argument that the limit of eighty statements means "eighty numbered paragraphs" and not "eighty factual assertions" is a more

sensible reading of the rule and is consistent with the way the rule has been applied in practice. The Court recognizes that, carried to an extreme, this interpretation could allow a party to make unlimited assertions of fact simply by manipulating paragraph headings. At the same time, Hall's position is problematic because it is unclear how the Court should determine exactly how many "facts" are asserted in a given statement. For example, "Sgt. Bill Hall supervised Field Training Officers" could be seen as one factual statement (about Hall's duties at the police department) or two statements (one about his rank and one about the task he performed). It could also be interpreted as containing a third, unspoken assertion that there exists such a person as Bill Hall. Enforcing the rule as Hall interprets it would require the Court to engage in an abstract and time-consuming inquiry with no clear principles to guide it.

Ultimately, the standard must be reasonable, at a point determined by the trial court's common sense. If a movant's Local Rule 56.1(a)(3) statement is unduly bloated in violation of the rule, the Court will "know it when it sees it." Aurora's statement of undisputed facts is not excessive or weighed down with unnecessary information. Even if it were excessive, however, Hall's motion could not be granted, because even Hall appears unsure of how many factual assertions Aurora actually makes and therefore of how many facts should be stricken as excessive. Nor does Hall provide any suggestions as to how the Court should choose which excess factual statements to strike. In light of all of the legal and factual uncertainty that enshrouds Hall's motion, the Court finds that any potential violation of the Local Rule is far outweighed by the interest in having this case adjudicated on its merits. Therefore, exercising its discretion to enforce Local Rule 56.1, the Court denies Hall's motion to strike portions of Aurora's Local Rule 56.1(a)(3) statement.

## A.    Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See also Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The Court views all facts in the light most favorable to Hall and draws all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255. Not all factual disputes will preclude summary judgment, however; rather, a genuine issue of material fact will only exist where there is evidence such that a jury "could reasonably find for the [nonmoving party]." *Id.*

## B.    Substantive Law:  FMLA Retaliation

The FMLA prohibits employers from retaliating or discriminating against employees for exercising their rights under the FMLA. *See* 29 U.S.C. § 2615(a) and (b) (prohibiting discrimination against persons who exercise or attempt to exercise FMLA rights, or participate in or institute FMLA-related proceedings or inquiries). Courts assess claims of FMLA retaliation under the same framework that they use to evaluate claims of retaliation under other employment statutes, such as the ADA or Title VII. *See Buie v. Quad Graphics*, 366 F.3d 496, 503 (7th Cir. 2004); *see also King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999).

To establish a prima facie case of unlawful retaliation, Hall must prove that (1) he engaged in statutorily-protected activity; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action. *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001). In this case, there is no dispute

that Hall took FMLA leave, thereby engaging in a protected activity, or that he suffered an adverse employment action when he was denied promotions for which he was eligible. Therefore, the case boils down to whether or not Hall can show that there was a causal link between his FMLA leave and the fact that he was not promoted. To establish the necessary causal link between a protected activity and an adverse employment action, a plaintiff must show that his protected conduct "was a substantial or motivating factor" in the employer's decision. *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions" *Culver*, 416 F.3d at 545 (quoting *Spiegla v. Hull*, 371 F.3d 928, 942 (7th Cir. 2004)). In proving a claim of retaliation under the FMLA, a plaintiff may use either a direct or an indirect method of proof. *Buie*, 366 F.3d at 503. The Court addresses these methods in turn.

### 1. Direct Method

A plaintiff using the direct method of proof must present evidence that creates a "triable issue of whether the adverse employment action of which [he] complains had a discriminatory motivation." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 721 (7th Cir. 2005) (internal citation omitted). Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant to prove by a preponderance of the evidence that the same action would have occurred in the absence of the protected conduct. *Spiegla*, 371 F.3d at 943. Summary judgment for the defendant is granted only if the defendant "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no

retaliatory motive." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Hall may use two types of evidence to proceed under the direct method of proof: "direct evidence" and "circumstantial evidence." *Lewis v. School District No. 70*, No. 06-4435, slip op. at 18 (7th Cir. Apr. 17, 2008) (citing *Rudin*, 420 F.3d at 720–21). Direct evidence is evidence that, if believed by the trier of fact, "will prove the fact in question without reliance upon inference or presumption." *Rudin*, 420 F.3d at 720. "Direct evidence is a 'distinct' type of evidence that uniquely reveals 'intent to discriminate,' which is a 'mental state.'" *Id.* (quoting *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus" and is therefore "rarely encountered." *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003) (internal quotes omitted).

However, direct evidence is not required under the direct method of proof. Hall may also use circumstantial evidence that suggests discrimination, "albeit through a longer chain of inferences." *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). The Seventh Circuit has given a non-exhaustive definition of circumstantial evidence that includes "ambiguous statements, suspicious timing, discrimination against other employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Sylvester v. SOS Children's Villages Illinois, Inc.* 453 F.3d 900, 903 (7th Cir. 2006) (quoting *Troupe*, 20 F.3d at 737). This "convincing mosaic" has been likened to a "work of visual art composed of a large number of tiny tiles that fit smoothly with each other." *Id.* Thus, a plaintiff can make out a prima facie case of discrimination by assembling a number of

- 18 -

pieces of evidence that, taken as a whole, provide strong support for a finding of discriminatory intent. *Id.*

## 2. Indirect Method

Hall may also attempt to make a prima facie case of discrimination using the indirect method of proof. The "indirect method" refers to the burden-shifting framework first recognized by the Supreme Court in the Title VII employment discrimination context in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The indirect method allows a plaintiff to establish a prima facie case of discrimination by demonstrating that (1) he engaged in protected activity or belonged to a protected class; (2) his performance met his employer's legitimate expectations; (3) despite this performance, he was subjected to an adverse employment action; and (4) similarly situated employees who did not engage in the protected activity or were outside the protected class were treated more favorably. *See, e.g., Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007). If the plaintiff can make this showing, the burden shifts to the defendant to articulate a non-discriminatory reason for its actions. *Id.* If the defendant meets its burden, it is entitled to judgment in its favor unless the plaintiff presents evidence to show that the defendant's proffered reason is a mere pretext for discrimination. *Id.* This means that the plaintiff must present evidence that calls into question the veracity of the defendant's explanation rather than its substantive merits. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) ("Pretext is more than a mistake on the part of the employer; it is a phony excuse."). The ultimate burden of proof remains with the plaintiff at all times. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotes omitted).

## C. Hall's Case Under the Direct Method of Proof

Hall does not have sufficient evidence to allow a rational trier of fact to find in his favor under the direct method of proof. First, Hall offers no "direct" evidence of discrimination. As discussed above, direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus," *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003) (internal quotes omitted), and will rarely, if ever, be found. *See Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir. 1992). Nowhere in the record is there any indication of an overt admission of discriminatory intent by Chief Powell, who is the relevant decisionmaker in this case, or by any other member of the Aurora Police Department. Therefore, Hall has no direct evidence of discrimination.

Of course, the absence of such incriminating direct evidence is neither surprising nor fatal to Hall's prima facie case of discrimination under the direct method of proof, as he may also meet his burden with a "convincing mosaic" of circumstantial evidence. However, Hall lacks adequate circumstantial evidence of retaliation, even when the Court construes all disputed facts and inferences in Hall's favor, as it must at the summary judgment stage. Hall's primary evidence that the decision not to promote him to lieutenant was the result of discrimination is a phone call he received from Commander Langston. According to Hall, Langston told him that his FMLA leave had been discussed at a Command Staff meeting in which the June 2006 promotions were discussed. (Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 35.) Hall claims that Langston told him that one of the Commanders said, "[w]ho the hell does Hall think he is that he can just go on this FMLA leave and leave us shorthanded." (*Id.*) Hall says that Langston hinted that the person who made the remark was Commander Groom. (Def.'s LR 56.1 Stmt., ¶ 33; Hall Dep. at 89.) Hall's

confrontations in May and July 2006 with his supervisor, Lieutenant Parks, over what Parks perceived as Hall's failure to properly notify him of his FMLA leave, can be seen as additional circumstantial evidence that some members of the police force command structure were annoyed with Hall when he exercised his FMLA rights. (Def.'s LR 56.1 Stmt., ¶ 31.)

The Court finds that this evidence is insufficient to create a prima facie case of FMLA retaliation. Simply put, an FMLA retaliation claim requires proof that a *decisionmaker* has acted for a prohibited reason. *Rogers*, 320 F.3d at 754. A decisionmaker is the individual "responsible for the contested decision." *Id.* (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)). In this case, it is undisputed that the ultimate decisionmaker for the promotions that Hall was pursuing was Chief Powell. (Def.'s LR 56.1 Stmt., ¶¶ 13-14.) Lieutenant Parks's actions and statements, therefore, do not help Hall, because expressions of discriminatory sentiments (assuming that this is what they were) by someone who was not involved in making an employment decision have no bearing on the ultimate issue: whether the decision was the result of discrimination. *See Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

The alleged remark by Commander Groom cannot be dismissed as easily because Groom, while not the ultimate decisionmaker, had input on the decision through his role on the Command Staff. Assuming that Commander Groom made discriminatory remarks about Hall, a jury could rationally conclude that his discriminatory animus tainted the decision not to promote Hall, provided that there was some "competent evidence that [Chief Powell] had acted as [Groom's] 'cat's paw' and rubber-stamped his recommendation." *Rogers*, 320 F.3d at 754; *see also Mateu-Anderegg v. School Dist. of Whitefish Bay*, 304 F.3d 618, 624 (7th Cir. 2002). Under this

"cat's paw" theory, Groom's alleged statement could provide a basis for denying summary

judgment if, for example, Hall could point to evidence that Groom had "so much influence [over

Powell] as to basically be [himself] the true functional decision-maker." *Brewer v. Bd. of*

*Trustees of Univ. of Illinois*, 479 F.3d 908, 918 (7th Cir. 2007) (internal quotes and citations

omitted). This might be the case if Powell was "totally dependent on [Groom] to supply the

information" on which his decision was based. *Id.* On the other hand, where a biased source

provides information as part of a decisionmaking process, the ultimate decision is not tainted "so

long as the decision maker does not artificially or by virtue of her role in the company limit her

investigation to information from that source." *Id.*

Hall has no evidence that such a situation was present in this case. All of the evidence

suggests that Chief Powell made the final decision on promotions independently after consultation

with the six-member Command Staff, of which Groom was only one member. (Def.'s LR 56.1

Stmt., ¶¶ 13-14, 38; Powell Dep. at 46-53.) There is no evidence that Commander Groom had

such an inordinate level of influence over Chief Powell that his input would control the outcome

of the promotional decision. The Seventh Circuit's decision in *Rozskowiak v. Village of*

*Arlington Heights*, 415 F.3d 608 (7th Cir. 2005), provides helpful context in assessing the

significance of Groom's alleged remark. In *Rozskowiak*, a police commander who allegedly

harbored ethnically-based animus towards the plaintiff participated in a committee (called, as in

this case, a "Command Staff") that advised the police chief on his decision to terminate the

plaintiff. *Id.* at 612-613. The Seventh Circuit held that because the command staff's

recommendation reflected a consensus of its members' views and there was no evidence that the

allegedly racist commander had "singular influence" over the police chief, the commander's

remarks about the plaintiff's Polish ethnicity did not show that discrimination influenced the employment decision. *Id.* at 613. Similarly, Groom's alleged remark in this case does not indicate that the panel's recommendations or Chief Powell's ultimate decision were motivated by discriminatory animus. Indeed, four other members of the six-member Command Staff, who are not accused of expressing anti-FMLA sentiments, joined Commander Groom in voting against Hall. (Def.'s LR 56.1 Stmt., ¶ 38.) As in *Rozskowiak*, "there is no circumstantial evidence that the decision [not to promote Hall] was based on anything but a legitimate, non-discriminatory analysis" of the candidates. 415 F.3d at 613.

As a second piece of circumstantial evidence, Hall points to the fact that his promotional packet was the only packet that contained information about FMLA leave. (Pl.'s Stmt. of Add'l Facts, ¶ 9.) The Court finds that this evidence has no probative value. If no officer had any information pertaining to leave from work in his promotional packet except for Hall, a reasonable jury might be able to conclude that Hall was singled out for having taken FMLA leave. However, two facts are clear: first, every packet that the Command Staff reviewed contained information about sick leave; and second, Hall was the only officer being considered for promotion who had taken FMLA leave. (Def.'s LR 56.1 Stmt., ¶ 42; Pl.'s Resp. To Def.'s LR 56.1 Stmt., ¶ 40; Powell Dep. at 46-53.) The only reasonable inference from this evidence is that Hall's promotional packet contained the FMLA information because he was the only candidate who had taken that type of leave. The mere fact that an employment decisionmaker is aware that an employee has a protected characteristic or has engaged in a protected activity, without more, cannot be considered evidence of discrimination. In the absence of any evidence that Hall was somehow singled out or that the promotional packet drew attention to his specific type of leave over the ordinary sick

leave taken by other candidates, there is no reasonable inference of a discriminatory motivation for the decision not to promote him.

Next, Hall points to the temporal proximity between his decision to take FMLA leave in May 2006 and his failure to be promoted in June 2006 as circumstantial evidence of retaliation. The Seventh Circuit has recognized that "suspicious timing" can be circumstantial evidence of employment discrimination. *See Troupe*, 20 F.3d at 737. At the summary judgment stage, the Court is required to view the facts in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. However, because the Seventh Circuit has specified *suspicious* timing as a type of circumstantial evidence (rather than merely fortuitous timing, or timing for which there is a much more persuasive explanation than discrimination) the Court believes that it is required to consider whether the timing Hall points to is in fact suspicious rather than merely accepting Hall's *ipse dixit*. The Court finds that Hall has no evidence of "suspicious" timing and that, in fact, the circumstances support Aurora's explanation for its actions.

It is undisputed that, prior to any discussion of FMLA leave, Hall had already been denied promotion in April 2006. (Def.'s LR 56.1 Stmt., ¶¶ 19-22.) Furthermore, uncontradicted testimony regarding the April 2006 decision not to promote Hall reveals that the Command Staff had issues with his performance. Deputy Chief Anderson told the Command Staff that Hall lacked the requisite "adaptability" to be promoted (Anderson Dep. at 42.); Commander DoBran said that Hall had not "stepped up to the plate" in his prior position (*Id.* at 99.); Commander Groom recalled someone saying that Hall was "not overly impressive" and expressing other criticisms. (Groom Dep. at 18-20.) Approximately two weeks passed before Hall went on FMLA leave, and the next promotions took place in June 2006, before Hall returned. Deputy Chief

- 24 -

Anderson has testified that not enough time had elapsed between the April and June promotional decisions for Hall to overcome the deficiencies identified when he was up for promotion in April. (Def.'s LR 56.1 Stmt., ¶ 38.) The timing issue, therefore, cuts in Aurora's favor. Before there was a possibility of FMLA discrimination (because Hall had not exercised his rights) the Command Staff had identified performance problems and recommended against promoting him. Hall had only two weeks of work in which to remedy his perceived deficiencies before the next set of promotions in June 2006. In discussing the June 2006 promotions, members of the Command Staff again identified weaknesses in Hall's performance. (DoBran Dep. at 38-40; Thomas Dep. at 29; Groom Dep. at 44.) Therefore, the timing of the June 2006 decision, taken in context, is not suspicious and does not support an inference of FMLA retaliation.

Nor does the timing of the other promotions for which Hall was considered support the conclusion that Hall was targeted for discrimination because of his FMLA leave. When Hall returned to work in July 2006, he was on the job for only five days before he went on medical leave. (Def.'s LR 56.1 Stmt., ¶¶ 43, 46-47.) When he returned to work in October 2006, he was on the job for only two days before he had to go on medical leave again. (*Id.*, ¶ 60.) Hall returned to light duty in March 2007, and did not return to his full duties until August 2007. (*Id.*, ¶ 60; Hall Dep. at 309-10.) All but one of the disputed promotional decisions took place after Hall went on FMLA leave and before he returned to full duty after his second medical leave, a time period in which he spent only about one week working full time at his regular job. While this course of events was unfortunate and was not Hall's fault, it appears that he was unable to change his superiors' perception that he was not ready for promotion because of the extremely limited amount of time he spent on the job between May 2006 and August 2007. The timing of Aurora's

decisions, far from being suspicious, supports Aurora's assertion that Hall's failure to secure a promotion was the result of a poor initial assessment coupled with events that prevented him from improving his stature in the eyes of his superiors.

Finally, Hall's assertion that the promotion of candidates who were ranked below him on the department's eligibility list is circumstantial evidence of discrimination falls flat. Hall points out that, in four successive promotions culminating with the April 2006 promotion of Sam Turnbow, the officer who was ranked highest on the department's eligibility list was selected for promotion. (Pl.'s Br. at 2.) Therefore, Hall argues, it was an unprecedented deviation when he was not promoted in June 2006, even though he was then the highest-ranked officer remaining on the list. Hall's interpretation of the facts is simply unreasonable. First, it is undisputed that the first two promotions Hall relies on—the August 2005 and November 2005 promotions—occurred before Chief Powell implemented the promotional review system that was in force at all times relevant to this case. (Def.'s LR 56.1 Stmt., ¶¶ 11, 12; Powell Dep. at 33.) Therefore, they cannot be compared to the later promotions, having been conducted under a different rubric. Furthermore, while Hall may have been the first to be "passed over," he certainly was not the last. Indeed, it is clear that in the June 2006 promotions, which Hall sees as the beginning of Aurora's pattern of discrimination against him, four other officers were "passed over" when lower-ranked officers were promoted ahead of them. (Def.'s LR 56.1 Stmt., ¶ 39, Ex.1.) Later, when Officer Hall was passed over in June 2007, so was Officer Hladik.[6] (Id., ¶ 61, Ex. 1.) If Officer Hall was

---

[6] Hall alleges that Hladik was passed over because, as Hall's union representative, he had supported Hall and accompanied him to meetings with department officials. (Pl.'s Br. at 13.) It is undisputed that Hladik was Hall's union representative, but there is no other factual support for Hall's accusation. In fact, Hall asserts elsewhere that Hladik had already given notice that he was retiring when the promotional decision was made. (See Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 68.)

the only person who had ever been passed over for promotion, this fact might support an inference that he was being singled out for discriminatory reasons. As the undisputed evidence shows, officers other than Hall who had no special FMLA history were also denied promotion while lower-ranked officers were promoted. Hall's suggestion at oral argument that those officers were only denied promotion in order to mask the police department's intentional discrimination against Hall is implausible and rests on mere speculation. It does not provide an evidentiary basis for a rational finder of fact to conclude that Hall was a victim of FMLA retaliation.

In summary, Hall has no direct admission of discriminatory intent and no evidence of suspicious timing, remarks by decisionmakers, or other circumstantial evidence with which to create a "convincing mosaic" that would allow a rational jury to find in his favor under the direct method of proof. Because a "genuine issue of material fact" will exist only where a rational trier of fact could find in the non-movant's favor, *Anderson*, 477 U.S. at 255, the Court finds that Hall has failed to show that there is a genuine issue of material fact under the direct method of proving FMLA retaliation.

## B.    Hall's Case Under the Indirect Method of Proof

Hall can also survive summary judgment with evidence that would allow a reasonable trier of fact to find in his favor under the indirect, burden-shifting method of proof. In the context of the FMLA, the indirect method allows a plaintiff to establish a prima facie case of retaliation by demonstrating that (1) he engaged in a protected activity; (2) his job performance met his employer's legitimate expectations; (3) despite this performance, he was subjected to an adverse employment action; and (4) similarly situated employees who did not engage in the protected

activity were treated more favorably. *See, e.g., Burnett v. LFW Inc.*, 472 F.3d 471, 481-2 (7th Cir. 2006). If Hall has evidence sufficient to make this showing, then summary judgment is inappropriate unless Aurora can provide a non-discriminatory explanation for denying Hall promotion. *McDonnell Douglas*, 411 U.S. at 802–03. If Aurora meets this burden, it is entitled to judgment in its favor unless Hall can produce evidence that would allow a reasonable jury to conclude that Aurora's explanation is pretextual. *Id.* at 803–05. A pretext is a "deliberate falsehood," *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006), and the focus is on whether "the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). The Court finds that Hall does not have sufficient evidence to survive Aurora's motion for summary judgment under the indirect method of proof.

First, Hall cannot establish a prima facie case of FMLA retaliation under the indirect method. It is conceded that Hall engaged in protected activity by taking FMLA leave and that he suffered an adverse employment action when he was not promoted to lieutenant, satisfying the first and third elements of the *McDonnell-Douglas* prima facie case. Fatal to Hall's case, however, is his inability to identify any "similarly situated" individual who did not take FMLA leave and who was promoted to lieutenant. Indeed, Hall has shown no correlation between FMLA leave and promotions. The record indicates that there were at least four officers—Peter Inda, Robert Hladik, Richard Handell, and Nicholas Coronado—who, like Hall, were "passed over" when lower-ranked candidates were promoted and they were not. (Def.'s LR 56.1 Stmt., ¶ 39, Ex. 1.) None of these officers had taken FMLA leave.

More to the point, Hall has not shown that he was "similarly situated" to any individual who *was* promoted. In its employment discrimination jurisprudence, the Seventh Circuit has defined the term "similarly situated" to mean "directly comparable [ ] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Employees are not similarly situated merely because they perform the same task; rather, the burden is on the plaintiff to show that there are no differentiating circumstances that could cause an employer to treat them differently for legitimate reasons. *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir. 2005). Aside from a bare-bones allegation that there were similarly situated officers who were promoted ahead of Hall merely because they had not taken FMLA leave (Pl.'s Br. at 17.), Hall's briefs and other filings disclose no effort to show that there were truly "no differentiating circumstances" other than FMLA leave that could have caused Aurora to treat the officers who were promoted more favorably. Given the number of specific criticisms of Hall's performance in the record, it would be very difficult to show that there was another officer with the same performance issues who was promoted. It is Hall's burden to make this showing, and he has failed to carry it. Therefore, he cannot make out a prima facie case of FMLA retaliation using the indirect method of proof.

Even if Hall had evidence to support a prima facie case under the indirect method of proof, Aurora would still be entitled to summary judgment because it has proffered a non-discriminatory explanation for its decision not to promote Hall, and Hall has no evidence to suggest that Aurora's explanation is a pretext—that is, a lie. It is undisputed that Chief Powell was the final decisionmaker each time that Hall was considered for promotion. (Def.'s LR 56.1 Stmt., ¶ 13-14.) It is also undisputed that he implemented a promotional process in which he made his decisions in

- 29 -

consultation with the six-member Command Staff. (*Id.*, ¶ 12.) Aurora has provided evidence that the Command Staff, when considering Hall as a candidate for promotion, had reservations about his past performance and his ability to perform the tasks of a lieutenant. This evidence supports Aurora's contention that Hall was denied promotion for legitimate, performance-based reasons, not in retaliation for taking FMLA leave.

In April 2006, the Command Staff met and discussed six candidates for promotion, including Hall. (Def.'s LR 56.1 Stmt., ¶ 19; Groom Dep. at 7; Gilloffo Dep. at 18.) As discussed in the preceding section, Command Staff members noted that Hall had mainly patrol experience, said that his performance as a supervisor was "not overly impressive," and referred to him as a "schmoozer." (Groom Dep. at 18-20.) Deputy Chief Anderson told the Command Staff that Hall had not shown "the appropriate adaptability to be promoted" and criticized his failure to take leadership initiative in a kidnapping case. (Anderson Dep. at 42-44.) Hall's commanding officer, Commander DoBran, said that Hall "had issues" and "hadn't really stepped up to the plate." (*Id.* at 99.) Hall was not promoted. In June 2006, when Chief Powell again decided not to promote Hall, there was a Command Staff meeting during which five out of the six Commanders recommended against promoting Hall. (Def.'s LR 56.1 Stmt., ¶ 38.) Again, the record shows that members of the Command Staff, including Deputy Chief Anderson and Commander DoBran, articulated performance-based reasons for their belief that Hall was not ready for promotion. (*Id.*; DoBran Dep. at 38-40; Thomas Dep. at 29; Groom Dep. at 44.) When confronted by Hall in June 2006 about the promotional decision, Commander DoBran mentioned Hall's performance in the Special Operations Group and his failure to "shine" as reasons for the decision. (Def.'s LR 56.1 Stmt., Ex. 6; Hall Dep. at 104.) Both Hall and Deputy Chief Anderson have testified that

when Hall asked Anderson why he was not promoted, Anderson pointed to problems with his performance during a kidnapping incident and a "weed and seed" operation. (Hall Dep. at 162-63; Def.'s LR 56.1 Stmt., Ex. 16.)

Thus Aurora has provided strong evidence for its assertion that Chief Powell made an independent decision not to promote Hall after he consulted with the members of the Command Staff, who articulated performance-based criticisms of Hall's work and who voted five to one against promoting Hall in June 2006. Due to medical problems unrelated to his FMLA leave, Hall was on light duty at the time of the June 2007 promotional decision and had only worked at full capacity for approximately seven days in the year prior to the June 2007 promotion. It is undisputed that no member of the Command Staff recommended promoting Hall in June 2007. (Def.'s LR 56.1 Stmt., ¶ 64.) After Hall returned to full duty in August 2007, only about two months elapsed before he was denied promotion for the final time. These circumstances all support Aurora's legitimate, non-discriminatory explanation for Hall's failure to be promoted four times between April 2006 and October 2007.

Because Aurora has come forward with a non-discriminatory explanation for Hall's failure to win promotion and supported it with evidence that could persuade a rational fact-finder, Hall must provide evidence to support a finding that Aurora's explanation is pretextual—a lie—in order to avoid summary judgment. Hall fails because there is no evidence from which a rational finder of fact could conclude that Aurora's explanation is a lie. Hall's evidence of FMLA-related animus is sparse and unpersuasive. Hall points to his argument with his supervisor, Lieutenant Parks, who was angry because Hall did not personally inform him of his FMLA leave. But Parks was not a member of the Command Staff and he did not participate in the decision not to

recommend Hall for promotion. Hall also claims that Commander Langston told him that one member of the Command Staff had criticized him for taking FMLA leave. (*Id.*, ¶ 33; Pl.'s Resp. to Def.'s LR 56.1 Stmt., ¶ 35.) Assuming this to be true, it is quite attenuated from the actual decision not to promote Hall. As discussed above, the ultimate decisionmaker was Chief Powell, and there is no evidence that Powell did not exercise his own independent judgment, regardless of the Command Staff's recommendation. But most damaging to Hall's case is the fact that five of the six members of the Command Staff recommended that he not be promoted. (Def.'s LR 56.1 Stmt., ¶ 38.) While Hall argues that "a jury could infer [that] the command staff was irrate [sic] with Hall," the only evidence to support this conclusion is a single statement by one member of the staff (assuming that the statement was actually made). On the other hand, copious evidence suggests that legitimate concerns, not invidious discrimination, motivated the Command Staff's recommendation.

None of Hall's other evidence would warrant a finding that Aurora's stated reason for not promoting him is a lie. Intent on showing discriminatory animus, Hall grasps at a number of straws. Hall's brief suggests that he was being harassed while on medical leave with improper requests for physical examinations and allegations of insubordination. (Pl.'s Br. at 6-7.) But the factual record is more complicated. Hall acknowledges that he was required, while on medical leave, to submit a "return to duty" form every thirty days and admits that he was not submitting this form regularly. (Def.'s LR 56.1 Stmt., ¶¶ 48, 50.) One of the forms he did submit was ambiguous because his doctor had circled both "Patient Returned to Restricted Duty" and "Patient Returned to Regular Work Duties" while adding a notation that said "no work @ this time." (*Id.*, ¶ 51; Pl.'s Ex. 36.) Under these circumstances, it is simply not reasonable to interpret Chief

Powell's request that Hall undergo an independent examination, which was provided for in his union contract, as some sort of witch-hunt fueled by animosity over Hall's earlier FMLA leave. When Hall filed a grievance because the doctor Chief Powell asked him to see was a psychologist and therefore not a "physician" as required by the union contract, Chief Powell withdrew his request and asked human resources to find another doctor. (*Id.*, ¶ 53.) After Hall refused to meet with the second doctor, Chief Powell asked that Hall be investigated for insubordination in October 2006. (*Id.*, ¶¶ 57-58.) Even if this was a sign of animosity towards Hall, it had no apparent connection with Hall's FMLA leave and no apparent connection with either the June 2006 promotion (which had already occurred) or the June and October 2007 promotions (which occurred eight months and one year later, respectively).

Finally, Hall points to Chief Powell's deposition testimony, which he claims contains evidence that FMLA retaliation was the true motivation for Powell's decision not to promote him. In his deposition, Powell testified that someone who "shirks" responsibility by not being on the job "when they are supposed to be there" is not qualified to be a supervisor. (Pl.'s Stmt. of Add'l Facts, ¶ 14.) Hall attempts to transform this seemingly innocuous (and obvious) statement into a smoking gun by linking it with another passage in which Powell stated that he takes sick time into account in making promotional decisions "[b]ecause it's important for supervisors to . . . be on the job." (*Id.*, ¶ 15.) But the very passages Hall quotes nullify any inference that Powell is expressing anti-FMLA bias against Hall, as Powell specifies that he is talking about a candidate who is

> taking, you know, time off . . . 30 days a year, and they're taking it a day - day at a time, day here, day there . . . that to me is a person that's not . . . promotable, because there's an appearance there that they're just using the sick time to . . . augment or supplement just time off of work.

(*Id.*) Hall's own excerpts from Powell's deposition testimony make clear that Powell is not criticizing department-approved FMLA leave, such as the leave that Hall took, but rather the practice of using sporadic sick days merely to "supplement" ordinary time off. No rational finder of fact would infer an anti-FMLA bias from the quotations Hall relies on.

Simply put, Aurora has advanced a legitimate, non-discriminatory explanation for its decision not to promote Hall that is consistent with the undisputed facts of the case. Hall has no evidence to show that Aurora's explanation is a lie and that Aurora's decision not to promote him was motivated by a desire to retaliate against him for exercising his rights under the FMLA. Furthermore, Aurora's legitimate explanation is actually superfluous because Hall cannot show that a similarly situated employee who did not exercise FMLA rights was treated more favorably than he was. This dooms his attempt to establish a prima facie case of FMLA retaliation under the indirect method of proof. Finally, as discussed in the preceding section, Hall has no direct evidence of discrimination and cannot construct a "convincing mosaic" of circumstantial evidence that would allow a rational trier of fact to find in his favor under the direct method of proof.

Hall's attempt, in a supplemental brief, to rely on the Seventh Circuit's recent decision in *Lewis* is unavailing because the facts of *Lewis* differ materially from those of the instant case. (*See* Pl.'s First Supplemental Resp. at 1.) Hall argues that both he and the plaintiff in *Lewis* were subjected to unrealistic expectations that suggest an intent to discriminate. The plaintiff in *Lewis* was forced to perform essentially all of the functions of her full-time job while on uncompensated FMLA leave. *Lewis*, slip op. at 6. Aurora, Hall alleges, was similarly unrealistic in expecting him to be able to show that he was worthy of promotion while at the same time transferring him out of the Special Operations Group, thereby limiting his ability to ameliorate his supposed performance

- 34 -

deficiencies. (Pl.'s First Supplemental Resp., ¶ 15.) The comparison is inapt. In *Lewis*, the Seventh Circuit held that a jury could conclude that the employer was setting the plaintiff up to fail in order to retaliate against her for taking FMLA leave. *Lewis*, slip op. at 21. In this case, Hall was transferred out of the SOG after he had already had performance issues, as he acknowledges. Aurora was under no legal duty to keep him in the same position, even though his performance was lacking, in order to give him the opportunity to remedy his performance and win a promotion. There is a clear difference between an employer acting to *create* a performance issue that will serve as a pretext for adverse action, which was the issue in *Lewis*, and an employer responding to a performance problem in a way that may have the effect of making future promotions more difficult. Unlike the employer's actions in *Lewis*, Aurora's actions in this case do not support an inference of discriminatory intent.

Hall also attempts to draw an analogy between remarks made at a board meeting in *Lewis* and the FMLA-related remarks allegedly made at a Command Staff meeting in this case. (Pl.'s First Supplemental Resp., ¶ 6.) In *Lewis*, the members of the school board, which was the body that made decisions regarding the plaintiff's employment, "discuss[ed] the FMLA with disdain" and actively encouraged the plaintiff's supervisor "to continue documenting any performance-related problems in order to build a case against Ms. Lewis that was unrelated to her absences." *Lewis*, slip op. at 7. The Seventh Circuit found that this conduct "raise[d] serious questions about [the board's] reason for discharging her." *Id.* at 20. The evidence in *Lewis*, which included overt group expressions of disdain for the FMLA and directions to "build a case" against the employee by the very body that controlled her employment, is easily distinguishable from evidence in the case at hand, where a single member of a panel that advised the actual decisionmaker may have

criticized Hall for taking FMLA leave. Nothing in *Lewis* takes this case out of the *Rozskowiak* "cat's paw" paradigm discussed and ultimately rejected above.

Finally, Hall argues that, as in *Lewis*, Aurora deviated from its ordinary decisionmaking process when it decided not to promote him, creating an inference that Aurora intended to discriminate against him. This is incorrect. The undisputed evidence is that, upon assuming the role of Police Chief, Chief Powell implemented a system in which he would choose candidates for promotion from a group of six eligible candidates in consultation with the Command Staff. (Def.'s LR 56.1 Stmt., ¶ 12.) The evidence discussed above indicates that this process was used at least as early as the April 2006 promotional decision, which occurred prior to Hall's FMLA leave in May 2006, and continued to be used at all relevant times. This is in stark contrast to *Lewis*, where there was evidence that the school board's ordinary decisionmaking procedures were circumvented and that the plaintiff was subjected to an extraordinary performance review, circumstances that could support an inference of discriminatory intent. *Lewis*, slip op. at 22. In short, *Lewis* does not help Hall because there are substantial factual dissimilarities between the cases. Ultimately Hall, unlike the plaintiff in *Lewis*, fails to "cast sufficient doubt upon [Aurora's] motives to make summary judgment an impermissible vehicle for the resolution of this case." *Id.* at 23-24.

Because there is no genuine issue of material fact and Aurora is entitled to judgment as a matter of law, the Court grants Aurora's motion for summary judgment.

## III. Conclusion

For the reasons set forth above, Aurora's motion for summary judgment is granted in its entirety.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: June 13, 2008.